OPINION
{¶ 1} Defendant-appellant, Harold Zweifel, Sr. ("appellant"), appeals the judgment of the Franklin County Municipal Court, whereby the trial court granted summary judgment in favor of plaintiff-appellee, Williams Creek Homeowners Association, Inc. ("appellee"), and ordered appellant and his attorney to pay appellee's attorney fees. *Page 2 
 {¶ 2} On October 25, 2000, appellant and his wife, Violet Zweifel, executed a contract offer to developer Dominion Homes, Inc. ("Dominion") for the purchase of Lot 4 at the Williams Creek subdivision and for the construction of a home on the lot. On October 30, 2000, Dominion accepted the offer. Along with the contract, appellant also signed a "Deed Restriction Summary Disclosure and Acknowledgement" ("Disclosure"). The Disclosure stated:
 All of the developments in which Dominion Homes, Inc. builds are subject to deed restrictions. Deed restrictions, also called restrictive covenants, are imposed upon all of the lots in a development as part of a general plan for the protection, benefit and mutual advantage of all of the homeowners in the community. * * *
 * * *
 Every new Dominion Homes community provides for an association of the lot owners to maintain common improvements, and also provides for the collection of assessments from homeowners to fund these activities.
 The Dominion Homes sales contract includes a provision that the home will be subject to restrictions pursuant to a general plan. * * *
 Please acknowledge that you have reviewed and understand this disclosure and summary in conjunction with the execution of your home purchase agreement with Dominion Homes, Inc., by signing below.
 {¶ 3} On November 13, 2000, appellant and Dominion executed a second contract to substitute Lot 22 for Lot 4 for the purchase price of $155,900. Thereafter, in December 2000, appellant and Dominion closed on the transaction described in the November contract. A deed was executed and delivered to appellant. The deed indicated that it was being conveyed subject to "conditions, restrictions and easements, *Page 3 
if any, contained in former deeds of record for said premises, subject to all of which this conveyance is made." Appellant was 79 years old at the time of this transaction.
 {¶ 4} Prior to the December closing, and prior to appellant executing the above-noted contracts, Dominion recorded a "Special Warranty Deed" on February 22, 2000, in the Franklin County Recorder's Office. The Special Warranty Deed encumbers lots in the Williams Creek subdivision, including Lot 22. The Special Warranty Deed also identifies appellee, the homeowners association for the Williams Creek subdivision, and Terry E. George, as Trustee. The Special Warranty Deed also provides that "[e]very Owner shall be deemed to have a membership in the Association."
 {¶ 5} Under the Special Warranty Deed, appellee must maintain the common areas of the Williams Creek subdivision subject to the "reasonable judgment" of appellee's board of trustees and "budgetary limitations." According to the Special Warranty Deed, "Common Property" is "all real and personal property now or hereafter acquired * * * and owned by [appellee] for the common use and the enjoyment of the Owners, or for the operation of [appellee]." The Special Warranty Deed states that "[a]ll uses of the Common Property shall benefit or promote the health, safety, welfare, convenience, comfort, recreation, and enjoyment of the Owners and occupants" of lots in the Williams Creek subdivision. It also states that the maintenance of the common areas "shall include, without limitation, maintenance, repair, and replacement of all landscaping and other flora, structures, and improvements situated upon the Common Property and all personal property used in connection with the operation of the Common Property." *Page 4 
 {¶ 6} The Special Warranty Deed requires homeowners to pay assessments to appellee, including annual, special, and lot specific assessments, which the board will determine based on annual estimates of expenses to maintain and improve the common property or to operate the association. As to these assessments, the Special Warranty Deed provides that they "together with interest thereon and any costs of collection, including reasonable attorneys' fees shall become the personal obligation of the Owner(s)" as of the date of the assessment. The Special Warranty Deed specifically provides for the filing of a lien against the owner's property.
 {¶ 7} Lastly, the Special Warranty Deed describes voting rights with appellee. In particular, the document states that "[v]oting and all other matters regarding the governance and operation of [appellee] shall be set forth in the Association Governing Documents." As an example, appellee's Articles of Incorporation establish that Dominion may exercise 100 percent of the voting power of the members of the association on any matter properly submitted to the association until the developer elects to relinquish that voting right, but no later than the date that the developer ceases to hold title to at least one of the lots in the development.
 {¶ 8} Prior to late 2005, Sterling Towne Properties ("Sterling") managed appellee's day-to-day activities. In late 2005, appellee's board of trustees hired Professional Subdivision and Association Managers, Ltd. ("PSAM") as the management company.
 {¶ 9} Thereafter, on February 22, 2006, under PSAM's management, appellee filed a complaint against appellant in municipal court. The complaint stated that appellant owed unpaid assessments, plus accrued penalties, interest and/or late fees to *Page 5 
appellee. Specifically, the complaint alleged that appellant owed $1,040.50 in accrued assessments, penalties, interest and/or late fees, plus attorney fees in the amount of $200. Thus, the complaint demanded judgment against appellant in the amount of $1,240.50, plus filing fees and other court fees, and interest from the date of judgment at the rate of 10 percent per year.
 {¶ 10} Appellee attached to the complaint Exhibit A, a copy of a 2006 bill to appellant for outstanding charges. The bill identified the following unpaid assessments (not including fees and finance charges): (1) $165 due in 2001; (2) $165 due in 2002; (3) $165 due in 2003; (4) $185 due in 2004; and (5) $205 due in 2005. David Dye, attorney for appellee and president of PSAM, signed an affidavit in support of the claim.
 {¶ ll} In response, appellant raised the following defenses: (1) quantum meruit; (2) waiver or estoppel; (3) failure to state a claim upon which relief may be granted; (4) the existence of a credit or set-off for collateral benefits paid to appellee; (5) failure to mitigate; (6) failure to join necessary parties; (7) failure of consideration; (8) unenforceable contract due to illegality; (9) statute of frauds; (10) unclean hands; (11) unconscionable contract/contract of adhesion; (12) lack of corporate status and standing; (13) breach by appellee; and (14) violation of the Consumer Sales Practices Act. Appellant also asserted the following counterclaims: (1) breach of contract; (2) unjust enrichment; (3) breach of fiduciary duty; (4) violation of the Consumer Sales Practices Act; (5) fraud; and (6) a request for declaratory judgment that appellee violated the Consumer Sales Practices Act.
 {¶ l2} Thereafter, the parties took depositions. Appellant testified as follows during his deposition. Appellant recognized his signature on the applicable real estate *Page 6 
contracts and on the "Deed Restriction Summary." Appellant was not aware of the homeowners association at Williams Creek when he signed the deed restriction summary or when he closed on the real estate transaction. After purchasing the real estate, neither appellant nor his wife paid assessments to appellee, and neither appellant nor his wife gave anything of value to appellee.
 {¶ 13} Next, appellant testified as follows:
 [Appellee's attorney:] * * * In your counterclaim * * * you have stated that [appellee] breached its obligations to you by oversights, acts, and omissions in its management of your subdivision. I need you to tell me what the association has done or has not done that you believe constitutes a breach of its obligations to you.
 [Appellant:] Nothing.
 * * *
 [Appellee's attorney:] * * * What do you mean by "nothing"?
 [Appellant:] Well, when I first moved in, they said — I unloaded my furniture and stuff in the driveway and the person that sold us the house come out and said [appellant], you don't need that snow blower because we're going to remove the snow. I gave the snow blower to my son, and they said we'll take care of the drive. I'm 70 years old. * * * They never removed nothing.
 [Appellee's attorney:] * * * [D]o you remember who that person was?
 * * *
 [Appellant:] He was the salesman. He was the sales manager at that time. * * *
 [Appellee's attorney:] Did you believe that he had the authority to speak for [appellee] when he told you you weren't going to need your snow blower?
 [Appellant:] I didn't know nothing about that. *Page 7 
 [Appellee's attorney:] Did you ever call or speak to [appellee] about removing your snow?
 [Appellant:] No.
 [Appellee's attorney:] Is there anything that you were told would not be done that has in fact happened that you think is a breach of [appellee's] duty to you?
 [Appellant:] Take care of the snow and drive and the sidewalks. That's it.
 * * *
 [Appellee's attorney:] Do you have any complaint about the way [appellee] has taken care of the ponds?
 [Appellant:] Well, there for a while they neglected it for about seven, eight, ten months, because the wild geese — I took my dog for a walk and wild geese droppings was so bad that I couldn't even give the dog a walk on the sidewalk.
 [Appellee's attorney:] Are the goose droppings the only thing that you are unhappy about with way the pond was taken care of, or was there anything else?
 [Appellant:] Mosquito[e]s.
 [Appellee's attorney:] Other than goose droppings and mosquito[e]s, anything else about the condition of the pond that you're unhappy about?
 [Appellant:] Ponds don't mean that much to me.
 * * *
 [Appellee's attorney:] Do you believe there are any areas within your subdivision that [appellee] is responsible for maintaining that you don't believe have been maintained?
 [Appellant:] I don't know. *Page 8 
 [Appellee's attorney:] * * * [O]ther than snow removal, did anyone from the association or anyone that you believe had anything at all to do with the association promise you that anything was going to be done on your lot or in your subdivision?
 [Appellant:] No.
 * * *
 [Appellee's attorney:] * * * Can you tell me any acts or facts that you believe are illegal that are involved in this lawsuit?
 [Appellant:] Sending out a bill to us and they didn't do nothing.
 [Appellee's attorney:] Other than sending a bill without doing anything, anything that you would say is illegal?
 [Appellant:] Not that I know of.
(Appellant Depo., 25-29, 36.)
 {¶ 14} In addition, appellant testified as follows:
 [Appellee's attorney:] [Appellant], you have also stated in your pleadings that [appellee] waived its rights to collect dues from you. Do you understand how or why a pleading was filed that says that?
 [Appellant:] No sir.
 [Appellee's attorney:] You have never been affirmatively told by anyone from the association not to pay your dues, have you?
 [Appellant:] No, sir.
(Appellant Depo., 34.)
 {¶ 15} Likewise, appellant testified that he did not know of anyone else who needed to be a party to the lawsuit. In addition, appellant testified as follows:
 [Appellee's attorney:] * * * Do you understand what a "failure to mitigate" means? *Page 9 
 [Appellant:] Yes.
 [Appellee's attorney:] Can you tell me any facts that you are aware of that support the claim that the association did not mitigate its damages?
 [Appellant:] Well, they got on one of these bills where they replaced trees. I go around through the project, several trees is dead. As far as I know, whether they ever replaced once or twice or how many times, I walk by and see they're dead. That's all.
 [Appellee's attorney:] Okay. Do you know whether those trees are in common areas or on private owners' lots?
 [Appellant:] They're in between the house and street next to the sidewalk, the outside, towards the street.
 * * *
 [Appellant:] The strip — there's a strip between the street, then sidewalk. That's where the trees are at.
 [Appellee's attorney:] I'm going to call those street trees * * *.
 [Appellant:] Okay. Street trees. That's a good name.
 [Appellee's attorney:] It makes sense, doesn't it? The street tree that you had seen that died and were replaced, do you have reason to believe that those were replaced by the association as opposed to being replaced by the owner of the home that they were in front of?
 [Appellant:] I do not know. I take care of my own trees.
(Appellant Depo., 34-36.)
 {¶ l6} Lastly, appellant testified that he had owned one other home before purchasing his home in Williams Creek. That home was not in a subdivision.
 {¶ 17} Mrs. Zweifel testified as follows during her deposition. Upon purchasing the real estate in the Williams Creek subdivision, neither Mrs. Zweifel nor appellant paid *Page 10 
assessments to appellee, and neither Mrs. Zweifel nor appellant gave anything of value to appellee. Moreover, appellee made no representations that the assessments need not be paid. *Page 11 
 {¶ 18} Lastly, Mrs. Zweifel testified as follows:
 [Appellee's attorney:] * * * Are you aware of any promises that were made by anyone that you believed to have authority for the homeowners association that have not been fulfilled?
 [Mrs. Zweifel:] Other than the salesman telling him that they would clean the snow off. That's all I know.
(V. Zweiful Depo., 10.)
 {¶ 19} Lisa Pearson, PSAM vice president and director of compliance, testified as follows during her deposition. The "common areas" of the Williams Creek subdivision consist of "the pond areas and a substantial amount of road frontage." (Pearson Depo., 11.) "Road frontage" exists "behind the private property in which there's a tree line," and appellee maintains the tree line by mowing the area and "mulching the trees." (Pearson Depo., 12-13.) Pearson then testified that the road frontage was part of the right-of-way owned by the city of Columbus. She testified, however, that the city does not maintain the property and she knew of no efforts to get the city to maintain it. She stated that she includes within appellee's budget the cost to maintain the road frontage.
 {¶ 20} Pearson also testified that appellee had rebid the landscaping work in an effort to trim the budget. However, a substantial reduction would have a negative impact on homeowners' satisfaction.
 {¶ 21} Brad Pickering worked as property manager from June 2004 to October 2005 when Sterling managed appellee. Pickering testified as follows. While Pickering managed appellee, appellee paid for maintaining the landscaping of foreclosed homes. Next, Pickering testified that he could not recall whether appellee filed litigation against *Page 12 
Williams Creek homeowners while Sterling managed the association. Pickering also testified that appellee requested "assessments [from the Department of Housing and Urban Development (HUD)] for the cost of maintaining HUD homes," but Pickering did not remember whether HUD paid the assessments. (Pickering Depo., 22.)
 {¶ 22} Pickering also testified that a "fairly average" homeowners association assessment for associations with homes "valued over $200,000 a year" would be $200. (Pickering Depo., 13-14.) Nevertheless, Pickering qualified that it is difficult to make such a conclusion because it is "hard to compare two subdivisions as far as what amenities they have." (Pickering Depo., 13.) Finally, Pickering testified that appellee would not have paid for work related to the model home at Williams Creek.
 {¶ 23} Terry George is a trustee of appellee. George is also the senior vice-president and treasurer for Dominion. George verified that, at the time, Williams Creek homeowners had no voting rights with appellee, but "we intend to relinquish control [to the homeowners] as soon as we can." (George Depo., 24.) George also testified as follows. The trustees are not required to have meetings, and they do not review appellee's budgets. Rather, the trustees delegate budgetary oversight to Dominion. Moreover, George has never personally reviewed appellee's expenses. The trustees do not "oversee the PSAM management." (George Depo., 21.) Rather, the "[individuals at Dominion" oversee PSAM management. (George Depo., 22.) Furthermore, George testified that it was his "understanding" that deed restrictions "are presented in the course of closing documents." (George Depo., 10.)
 {¶ 24} Next, George admitted that, as a trustee, he is responsible for ensuring the corporate existence of the homeowners association. Appellant's counsel then *Page 13 
asked George questions about: (1) an April 28, 2005 certificate from the Ohio secretary of state that cancelled appellee's corporate status for its failure to file a statement of continued existence; and (2) appellee's May 1, 2006 application for corporate reinstatement, which erroneously indicated the cancellation of appellee's corporate status as being April 28, 2006, rather than April 28, 2005. As to this mistaken date of cancellation, George testified that he had not been aware of the mistake previously.
 {¶ 25} After the parties took depositions, appellee filed a motion for summary judgment. Appellee argued that appellant and Mrs. Zweifel had refuted all defenses and counterclaims in their depositions. Appellant opposed appellee's summary judgment motion. Appellant also filed its own summary judgment motion. Appellant's motion included a 2006 projected operating budget for the Williams Creek subdivision, and that budget included $47,678.82 for a 2006 landscaping contract. Appellant also included a 2005 operating budget indicating that appellee paid $31,651.87 for a landscape contract. Appellant also included the following: (1) a November 2, 2006 affidavit from Fortunato Merullo, president of a landscaping service, who verified that, in 2005, the landscaping service installed and maintained flowers at the Williams Creek model home; (2) Merullo's landscaping service's June 1, 2005 invoices for services at the Williams Creek subdivision, addressed to Sterling at Pickering's attention; (3) an invoice for $140.91 for the landscaping service's work at the Williams Creek model home; (4) an invoice for $232.72 for the landscaping service's work at the Williams Creek entrance; and (5) a copy of a July 2005 check for $373.63 from appellee, in the care of Sterling, paid to Merullo's landscaping service. *Page 14 
 {¶ 26} The trial court granted appellee's summary judgment motion, dismissed appellant's counterclaims, and awarded appellee $1,040.50 plus interest and attorney fees. The trial court scheduled a hearing to determine the amount of attorney fees to be awarded. Before that hearing, appellee filed a motion for sanctions for frivolous conduct pursuant to R.C. 2323.51. In the motion, appellee stated:
 Following [appellee's] taking of [appellant's] deposition (at which [appellant] admitted that there was no factual support for any of the defenses or claims raised by [appellant's] counsel), written demand was made of [appellant's] counsel that all of [appellant's] claims and counterclaims be dismissed based on the entire and absolute lack of factual support therefor. * * * [Appellant's] counsel elected to ignore [appellee's] request, and proceeded with the case. * * *
 * * * While [appellant] is legally obligated by the terms of the deed restrictions to pay the legal fees incurred by [appellee] in this action, justice would demand that such obligation be borne (or at least shared) by [appellant's] legal counsel. R.C. § 2323.51 provides the mechanism for justice to be met in this instance, in that the actions of [appellant's] counsel were frivolous, justifying an award of [appellee's] legal fees and costs as provided in § 2323.51(B)(4).
 {¶ 27} Likewise, after the trial court issued its summary judgment decision, appellee submitted a "summary of attorney's fee damages." In the summary, appellee asserted that it incurred $25,529.50 in legal fees in the handling of this litigation.
 {¶ 28} In January 2007, the trial court held a hearing limited to the amount of attorney fees appellee requested. The hearing did not pertain to appellee's R.C. 2323.51 motion. At the attorney fees hearing, appellee presented the testimony of attorney Robert Behal, who testified that costs in the amount of $25,000 would be reasonable. At the conclusion of the hearing, appellee requested $24,674.50 in attorney fees. *Page 15 
 {¶ 29} In April 2007, appellant held a hearing on appellee's motion for sanctions. During the hearing, the following exchange took place between the trial court and the attorneys for appellant and appellee:
 [THE COURT:] Today, I am determining whether or not the — if there is to be any attorney's fees awarded in any amount from a buck up to the $17,000, whether or not it is to be awarded against [appellant] or [appellant's attorney] for frivolous conduct.
 Because it seems to me that under my reading of the case law, if I were to find that there were attorney's fees due and owing under the agreement — or under the ruling, rather, on the motion for summary judgment and if I were to find that the cause of those attorney's fees was conduct of counsel as opposed to conduct attributable to the party, then the award is as against counsel, not the party.
 * * *
 [APPELLANT'S ATTORNEY:] * * * I just wanted to make sure that we're talking about the same reasonable attorney's fees.
 THE COURT: Correct.
 [APPELLANT'S ATTORNEY:] Whatever they be, between zero and X, and it is simply a matter of whether all or a portion of those will be assessed against [appellant] or [appellant's attorney].
 THE COURT: Correct.
 [APPELLANT'S ATTORNEY:] And if they are assessed against [appellant's attorney], it is to be because you find violations of frivolous conduct, State ORC 2323.51.
 THE COURT: Correct.
(Tr., 51-53.)
 {¶ 30} In addition, during the hearing, appellant's attorney testified that appellant "had a stroke a few years earlier and was not really as aware as he had been as a *Page 16 
younger man." (Tr., 62.) Later, during her testimony, appellant's attorney clarified that appellant is "not mentally impaired. * * * He has trouble verbalizing * * * what he's trying to say. And he also has a lot of trouble with his emotions as a result of his stroke. And so if he gets cornered, he gets agitated and starts saying things that don't make sense." (Tr., 109.)
 {¶ 31} Thereafter, when the trial court rendered its decision on the amount of attorney fees to be awarded, it subtracted from appellee's request $4,417.50, which reflected fees incurred while appellee's attorney prepared for trial after the scheduled trial was continued. Thus, the trial court awarded appellee $20,257 in attorney fees. The trial court then discussed appellee's R.C. 2323.51 motion.
 * * * [A]fter the discovery depositions and the most basic review of Ohio law, [appellant's] counsel continued to assert affirmative defenses and counterclaims that had no basis in fact or law. [Appellant's] own deposition testimony confirmed that [appellee] had made no promise which it had failed to fulfill, not entered into any agreement with him, that nothing of value had been paid to [appellee] or given to [appellee] by [appellant], that [appellee] had fulfilled every duty and obligation to [appellant] and that [appellee] never made any untrue representations to him upon which he relied to his detriment. In fact [appellant] testified that there was no one reason he could specify for his failure to pay the annual assessment. Furthermore, assuming [appellant's] own sworn testimony to be totally true, it did not support the applications of law that [appellant's] counsel continued to argue.
 It is clear to this court based upon [appellant's] counsel's testimony at the evidentiary hearing that she continued to pursue the affirmative defenses and counterclaims based upon her personal suspicions that the actions of PSAM and Dominion Homes (not parties to this action) were improper. [Appellant's] counsel was unable to establish any evidence or legal theory whatsoever which would constitute an affirmative defense or would support any of the counterclaims against [appellee] in this action. *Page 17 
Even after being put on notice by [appellee's] counsel that her actions in continuing to litigate unsupported and unsubstantiated claims would be grounds for a motion for sanctions, [appellant's] counsel continued to litigate these matters. It is for all these reasons that this court finds her conduct to be "frivolous" within the meaning of 2323.51 (A)(2)(a)(ii).
 * * * [Appellee] is hereby awarded sanctions against [appellant's] counsel * * * in the amount of $13,130.31. The remaining reasonable attorney fees of $7,126.69 are awarded against [appellant].
(Emphasis omitted.) The trial court emphasized that the attorney fee award against appellant's attorney is based on legal fees appellee incurred after appellant's deposition.
 {¶ 32} Appellant appeals, raising six assignments of error:
 Assignment of Error Number 1: The Trial Court Erred in Granting Summary Judgment to the Plaintiff-Appellee.
 Assignment of Error Number 2: The Trial Court Erred in Dismissing the Defendant's-Appellant's Counter-Claim.
 Assignment of Error Number 3: The Trial Court Erred by Assessing Damages without Conducting an Evidentiary Hearing.
 Assignment of Error Number 4: The Trial Court Erred When it Determined Counsel to Have Violated R.C. § 2323.51.
 Assignment of Error Number 5: The Trial Court Erred in Awarding Attorney Fees to an Attorney Acting in a Pro Se Capacity.
 Assignment of Error Number 6: The Trial Court was Without Jurisdiction to Adjudicate this Matter Because the Plaintiffs-Appellee's Prayer Exceeded $15,000 — the Jurisdictional Limit for Municipal Court.
 {¶ 33} Appellant's first and second assignments of error concern the trial court's decision to grant summary judgment in favor of appellee, which resulted in a judgment *Page 18 
against appellant on appellee's collection action and a dismissal on appellant's counterclaims. Appellate review of summary judgments is de novo. Koos v. Cent. Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579, 588, citing Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704,711. When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. Maust v. Bank One Columbus, N.A. (1992),83 Ohio App.3d 103, 107; Brown at 711. We must affirm the trial court's judgment if any grounds the movant raised in the trial court support it.Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38, 41-42.
 {¶ 34} Pursuant to Civ. R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party.Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66.
 {¶ 35} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material *Page 19 
element of the nonmoving party's claim." Dresher v. Burt,75 Ohio St.3d 280, 292, 1996-Ohio-107. Once the moving party meets its initial burden, the non-movant must set forth specific facts demonstrating a genuine issue for trial. Id. at 293. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the non-moving party. Murphy v.Reynoldsburg, 65 Ohio St.3d 356, 358-359, 1992-Ohio-95, quotingNorris v. Ohio Std. Oil Co. (1982), 70 Ohio St.2d 1, 2.
 {¶ 36} We first address appellant's assignments of error as they relate to the defenses he raised against appellee's collection action. Initially, we note that, on appeal, appellant does not challenge the trial court's summary judgment decision as it pertains to each of appellant's defenses and counterclaims. Thus, we need only address the specific challenges appellant raises here. See State v. 1981 Dodge RamVan (1988), 36 Ohio St.3d 168, 169-170.
 {¶ 37} Appellant first challenges the trial court's decision to reject his defenses and conclude that appellee was entitled to summary judgment on its collection action. In doing so, appellant initially contends that he did not knowingly, voluntarily, and intentionally agree to pay appellee assessments. This argument appears related to appellant's contract claims. See Kostelnik v. Helper, 96 Ohio St.3d 1,2002-Ohio-2985, ¶ 16, quoting Perlmuter Printing Co. v. Strome,Inc. (N.D.Ohio 1976), 436 F.Supp. 409, 414 (recognizing that the "`[e]ssential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration'"). However, we find such an argument inapplicable here. *Page 20 
 {¶ 38} The Restatement of the Law 3d, Property, Servitudes (2000) 98, Section 6.5, generally recognizes that it is within the purview of a homeowners association to level assessments against individual lot owners. Typically, compulsory membership in a homeowners association and the obligation to pay assessments to the association are created through servitudes, i.e., deed restrictions, created with a subdivision. SeeJohnson's Island Property Owners' Assn. v. Nachman (Nov. 19, 1999), Ottawa App. No. OT-98-043. "A servitude is a legal device that creates a right or an obligation that runs with land or an interest in land." Restatement of the Law 3d, Property, Servitudes (2000) 8, Section 1.1. See, also, Westwood Homeowners Assn. v. Lane Cty. (1993), 318 Or. 146,153, quoting Cunningham, Stoebuck, and Whitman, The Law of Property 494, Section 8.27 (1984) (recognizing that a servitude is an "`interest[ ] in land in the same family as easements'").
 {¶ 39} Here, the Special Warranty Deed identified the homeowners association for the Williams Creek subdivision. The Special Warranty Deed imposed membership in the association upon Williams Creek homeowners and required members to pay assessments to the association. Nonetheless, appellant argues that he need not pay assessments to the association because, in part, he did not knowingly and intentionally agree to such a requirement. Appellant testified that he was not aware of the association when he signed the Disclosure or when he closed on the property. However, "`[a] party that purchases land with * * * constructive notice of a restriction upon such land will not be permitted to act in violation of the terms of that restriction.'"Nachman, quoting Bailey Dev. Corp. v. MacKinnon-Parker, Inc. (1977), 60 Ohio App.2d 307, paragraph three of the syllabus. *Page 21 
 {¶ 40} Constructive notice is that which the law regards as sufficient to give notice and is regarded as a substitute for actual notice. In reEstate of Fahle (1950), 90 Ohio App. 195, paragraph two of the syllabus;Manning v. Dept. of Transp. (Apr. 24, 1997), Franklin App. No. 96API07-931. Generally, "[w]hen restrictions are recorded in deeds within the seller's chain of title, subsequent purchasers are deemed to have constructive notice of those restrictions and are bound by them."Kimberly Recreation Assn. v. Butts (Apr. 10, 1997), Franklin App. No. 96APG09-1202. Here, the Special Warranty Deed conveyed property in the Williams Creek subdivision with the homeowners association servitude. The Special Warranty Deed was filed in the recorder's office. It included Lot 22, the property ultimately conveyed to appellant in the chain of title. Thus, in accordance with Butts, appellant is deemed to have constructive notice of the servitude related to appellee, including his obligation to pay assessments. In imputing constructive notice on appellant, we also find it significant that: (1) the deed indicated that it was being conveyed subject to "conditions, restrictions and easements, if any, contained in former deeds of record for said premises, subject to all of which this conveyance is made"; and (2) appellant signed the Disclosure, which informed appellant of a deed restriction. Therefore, neither the evidence nor the law supports appellant's argument that he need not pay assessments to appellee because he did not knowingly and intentionally agree to such a requirement.
 {¶ 41} Next, appellant argues that he need not pay the assessments to appellee because such a servitude is unconscionable and, therefore, unenforceable. Unconscionability is a term long associated with contract law and is aimed at protecting buyers from contracts that subject them to unduly harsh or unconscionable obligations. *Page 22 
See Hurst v. Ent. Title Agency, Inc., 157 Ohio App.3d 133,2004-Ohio-2307, ¶ 20; Restatement of the Law 3d, Property, Servitudes (2000) 483, Section 3.7, Comment a. Servitudes exist through conveyances of real property. See Restatement of the Law 3d, Property, Servitudes (2000) 8, Section 1.1; Westwood Homeowners Assn. at 153;Nachman. However, certain contract law principles have been applied to situations covering real property. As an example, in NottingdaleHomeowners' Assn., Inc. v. Darby (1987), 33 Ohio St.3d 32, the Ohio Supreme Court applied contract principles to the declarations of a condominium. In this regard, Nottingdale applied contract principles to situations involving real property, given that, pursuant to R.C. 5311.01(K), a condominium is a form of real property and, pursuant toNorthwoods Condominium Owners' Assn. v. Arnold, 147 Ohio App.3d 343,2002-Ohio-41, ¶ 2, a condominium's declarations create servitudes that run with the land. Indeed, Restatement of the Law 3d, Property, Servitudes (2000) 483, Section 3.7 has recognized that "the unconscionability doctrine has become an integral part of modern servitudes law." Id. at Comment a. Thus, the doctrine of unconscionability is referenced in the Restatement of Property pertaining to Servitudes, and, as appellee concedes, the Restatement guides us in the interpretation and analysis of the law of servitudes. See, e.g., Evans v. Blenry Ltd. (June 29, 1976), Franklin App. No. 75AP-453.
 {¶ 42} Specifically, Restatement of the Law 3d, Property, Servitudes (2000) 483, Section 3.7 states that "[a] servitude is invalid if it is unconscionable." The issue of unconscionability is a question of law.Taylor Bldg. Corp. of Am. v. Benfield, 117 Ohio St.3d 352,2008-Ohio-938, ¶ 34. Unconscionability includes both "`"an absence of meaningful choice on the part of one of the parties together with contract terms which *Page 23 
are unreasonably favorable to the other party."'" Id. at ¶ 33, quotingLake Ridge Academy v. Carney (1993), 66 Ohio St.3d 376, 383, quotingWilliams v. Walker-Thomas Furniture Co. (C.A.D.C. 1965), 350 F.2d 445,449. The party asserting unconscionability of contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable. Id. at ¶ 33.
 {¶ 43} Procedural unconscionability considers the circumstances surrounding the contracting parties' bargaining, such as the parties'" `age, education, intelligence, business acumen and experience,'" and on "`who drafted the contract, whether alterations in the printed terms were possible, and whether there were alternative sources of supply for the goods in question.'" Id. at ¶ 43, quoting Collins v. Click Camera Video (1993), 86 Ohio App.3d 826, 834. "`Factors which may contribute to a finding of unconscionability in the bargaining process [i.e., procedural unconscionability] include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors.'" Taylor Bldg. at ¶ 43, quoting Restatement of the Law 2d, Contracts (1981), Section 208, Comment d.
 {¶ 44} In arguing that the servitude regarding the assessment to appellee culminated from procedural unconscionability, appellant claims that he was first presented with a copy of the Special Warranty Deed containing details of the association in conjunction with the closing documents. However, we decline to *Page 24 
conclude that the assessment servitude was unduly imposed upon appellant without proper notice, explanation or opportunity for discussion in the bargaining process. Before the closing, appellant signed the Disclosure, which informed appellant of the assessments. Likewise, the Special Warranty Deed was recorded in the recorder's office and, as a public record, was available for appellant's inspection.
 {¶ 45} Appellant also maintains that he was a stroke victim prior to the sales transaction and suffered a permanent continuing impairment as a result. While appellant's stroke was discussed at the April 2007 sanction hearing, appellant provided no such evidence for the trial court's consideration before its ruling on summary judgment. Thus, we decline to consider the issue in reviewing the trial court's summary judgment decision. See Butler v. Peck (May 29, 2001), Franklin App. No. 00AP-851.
 {¶ 46} Appellant also claims that he did not have the age, education or business acumen to digest the servitude. However, there is nothing in the record to establish that appellant did not have the capacity to comprehend the servitude or the real estate transaction surrounding the servitude.
 {¶ 47} Lastly, appellant argues that he had no ability to negotiate the terms of the assessment servitude and, therefore, that the transaction surrounding the servitude is akin to a contract of adhesion. A contract of adhesion is "a standardized form contract prepared by one party, and offered to the weaker party, usually a consumer, who has no realistic choice as to the contract terms." Taylor Bldg. at ¶ 48. Appellant maintains that he did not have an equal bargaining position in the real estate transaction and, therefore, the assessment servitude is unconscionable. In support of his arguments, appellant notes that, inNottingdale, the case involving a condominium's declarations, *Page 25 
the Ohio Supreme Court, in dicta, stated that "[a] contract of adhesion, where the party with little or no bargaining power has no realistic choice as to terms, would * * * not be supportable." Id. at 37, fn. 7.
 {¶ 48} Here, while the documents pertaining to the real estate transaction, and in particular the assessment servitude, were "standardized" forms and had qualities of a contract of adhesion, we decline to conclude that the terms of the assessment servitude culminated from procedural unconscionability. First, we note that, afterNottingdale, the Ohio Supreme Court held that "even a contract of adhesion is not in all instances unconscionable per se." TaylorBldg. at ¶ 49. In addition, in Taylor Bldg., the Ohio Supreme Court indicated that inequality in bargaining power alone does not equate to procedural unconscionability. Id. at ¶ 50. Regardless, we reject appellant's arguments, given that the record is devoid of evidence that appellant had no opportunity to foster a bargain on the price or any other aspect of the real estate transaction in light of the assessment servitude. Furthermore, the record is devoid of evidence that appellant entered into the real estate transaction under fraud or duress. SeeTaylor Bldg. at ¶ 50 (declining to find procedural unconscionability, "[e]ven assuming that the parties' bargaining power was not equal," where the record did not demonstrate that the complaining party to a contract was defrauded).
 {¶ 49} Accordingly, we conclude that the evidence does not establish that the assessment servitude culminated from procedural unconscionability. Thus, we need not examine whether the assessment servitude is substantively unconscionable. See Taylor Bldg. at ¶ 33. Regardless, for completion of analysis, we also conclude that the *Page 26 
assessment servitude is not substantively unconscionable. Substantive unconscionability:
 * * * [I]nvolves factors relating to * * * terms themselves and whether they are commercially reasonable. See Cronin [v. California Fitness, Franklin App. No. 04AP-1121, 2005-Ohio-3273]. * * * [C]ourts have considered the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability. Cronin, citing Collins v. Click Camera Video, Inc. (1993), 86 Ohio App.3d 826 * * *.
Khoury v. Denney Motors Assoc, Inc., Franklin App. No. 06AP-1024,2007-Ohio-5791, ¶ 12.
 {¶ 50} Appellant argues that the assessment servitude is substantively unconscionable because he has no voting rights in the homeowners association. However, appellant provides no case law establishing that an assessment servitude is substantively unconscionable merely because a homeowner does not have voting rights in the homeowners association.
 {¶ 51} Next, appellant notes Pickering's testimony that a "fairly average" homeowners association assessment for homes "valued over $200,000 a year" would be $200, and we recognize that, in 2005, appellee's assessment for his $155,900 purchased home was $205. (Pickering Depo., 13-14.) However, Pickering equated the fairness of assessments with the value of a home, and, in regard to appellee's summary judgment motion, appellant provided no evidence in relation to the particular value of appellant's home through the years. In this regard, we have no basis to measure, in light of Pickering's testimony, the reasonableness of appellee's assessments. Likewise, we note that Pickering qualified his testimony by indicating that it is difficult to make a general comparison of homeowners association assessments for different *Page 27 
subdivisions. See, also, Restatement of the Law 3d, Property, Servitudes (2000) 98, Section 6.5, Comment c (stating that the "[r]easonable allocation [of homeowners association assessments] depends on the circumstances"). Thus, we conclude that Pickering's testimony does not establish that the assessment servitude is substantively unconscionable.
 {¶ 52} For all of these reasons, we conclude that the assessment servitude here was not procedurally or substantively unconscionable. Therefore, we find no basis for appellant's defense of unconscionability.
 {¶ 53} We next address appellant's defense raised under the Ohio Consumer Sales Practices Act ("CSPA"). Specifically, appellant raises R.C. 1345.03(A) and (B)(1) of the CSPA, which states, in pertinent part:
 (A) No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.
 (B) In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:
 (1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement[.]
 {¶ 54} Appellant argues that the CSPA applies here because the assessment servitude was imposed at the real estate closing at the "last minute" and in exploitation of appellant's "physical infirmities and limitations." Appellant also asserts that precedent exists to apply the CSPA to transactions involving the sale of a home. *Page 28 
 {¶ 55} We have held that the CSPA applies to transactions involving new home construction. Saraf v. Maronda Homes, Inc. of Ohio, Franklin App. No. 02AP-461, 2002-Ohio-6741, ¶ 41. However, in a transaction involving the construction of a home and the sale of real property, the CSPA is inapplicable to the portion of the transaction involving the real property. Morrison v. Skestos, Franklin App. No. 04AP-244,2004-Ohio-6985, ¶ 13-14. Here, appellant is challenging a servitude, which, as noted above, concerns real property. See Restatement of the Law 3d, Property, Servitudes (2000) 8, Section 1.1. As such, appellant is challenging the real property aspects of the transaction with Dominion, and the CSPA is inapplicable. Nevertheless, to the extent that appellant raises the CSPA, and in particular R.C. 1345.03, for alleged unconscionable acts pertaining to appellant being taken advantage of for his "mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement," we reject these arguments for the reasons we discussed above.
 {¶ 56} Next, appellant argues as unenforceable the portion of the assessment servitude that requires appellant to pay the attorney fees that appellee incurs to collect outstanding assessments. The Ohio Supreme Court has held that "two parties, in a non-commercial transaction, may lawfully contract to require, in a suit between them, the payment by the unsuccessful party of the prevailing party's attorney fees." Nottingdale at 33. As noted above, Nottingdale involved individuals that purchased a condominium unit that was subject to membership in a homeowners association pursuant to a condominium declaration. Id. at 36. The declaration provided that "in any action * * * to collect delinquent assessments, reasonable attorney fees incurred by the homeowners' association shall be paid by the defaulting unit owner." Id. The Ohio *Page 29 
Supreme Court upheld the right for parties to enter into such attorney fee shifting arrangements, and held that:
 * * * [Provisions contained within a declaration of condominium ownership and/or condominium by-laws requiring that a defaulting unit owner be responsible for the payment of attorney fees incurred by the unit owners' association in either a collection action or a foreclosure action against the defaulting unit owner for unpaid common assessments are enforceable and not void as against public policy so long as the fees awarded are fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances of the case.
Id. at 37.
 {¶ 57} Here, in arguing against his obligation to pay attorney fees pursuant to the assessment servitude, appellant reiterates that the servitude equates to a contract of adhesion, and appellant reiterates that he was in an unequal bargaining position when he entered the real estate transaction involving the servitude. We recognize, as noted above, that, in Nottingdale, the Ohio Supreme Court, in dicta, spoke unfavorably toward contracts of adhesion and situations where parties are in unequal bargaining positions. Id. at 37, fn. 7. Nevertheless, we again emphasize that, after Nottingdale, the Ohio Supreme Court indicated that a contract of adhesion is not "in all instances" per se unenforceable. Taylor Bldg. at ¶ 49. Moreover, for the reasons noted above, we reject appellant's arguments pertaining to the servitude being unenforceable as a contract of adhesion and as the product of unequal bargaining positions.
 {¶ 58} Next, we recognize that, in Nottingdale, the Ohio Supreme Court indicated that attorney fee shifting arrangements would be unenforceable if culminating from "misunderstanding, deception or duress." Id. at 35. However, we noted above that the record is devoid of evidence that appellant entered into the real estate transaction under *Page 30 
fraud or duress. Likewise, we reject any contention that the attorney fee shifting arrangement culminated from a "misunderstanding," given the constructive notice imputed on appellant in regard to the assessment servitude, which contained the attorney fee shifting arrangement.
 {¶ 59} In addition, we find inapposite appellant's reliance onChase Manhattan Mtge. Corp. v. Tudor (Dec. 7, 2007), United States District Court for the Southern District of Ohio, Eastern Division, Case No. 2:06cv26, where the federal court held that Nottingdale "carv[ed] out an exception [to case law disfavoring attorney fee shifting arrangements] where the parties have equal bargaining positions, and the promise to pay attorneys' fees is arrived at through free and understanding negotiation." Tudor involved an attorney fee shifting arrangement in a mortgage. Relying on Nottingdale, the federal court held unenforceable the fee shifting arrangement because the mortgage was a "standard, pre-printed form contract," and pre-printed "`form documents * * * by definition are not negotiated agreements.'"Tudor, quoting In re Lake (Bankr.Ct.Ohio 2000), 245 B.R. 282, 287.
 {¶ 60} However, Tudor was decided before Taylor Bldg., where the Ohio Supreme Court concluded that agreements culminating from unequal bargaining positions or contracts of adhesion are not per se unenforceable. Likewise, we reiterate our rejection of appellant's arguments pertaining to the servitude being an unenforceable contract of adhesion and the product of unequal bargaining positions.
 {¶ 61} We recognize, however, that, pursuant to Nottingdale, we must examine whether the attorney fee award is "fair, just and reasonable as determined by the trial court upon full consideration of all of the circumstances." Id. at 37. Here, given the *Page 31 
testimony of attorney Behal, we conclude that the attorney fee award against appellant is fair, just, and reasonable in accordance withNottingdale. Accordingly, we do not render unenforceable the portion of the assessment servitude that requires appellant to pay the attorney fees appellee incurs to collect outstanding assessments.
 {¶ 62} The next defense appellant raised was appellee's lack of legal capacity to initiate the collection action. As noted above, in April 2005, appellee's corporate status was canceled for its failure to file a statement of continued existence. In February 2006, appellee initiated the collection action, and, in May 2006, appellee filed for corporate reinstatement.
 {¶ 63} A corporation may sue and be sued. R.C. 1701.13(A). Generally, a corporation that has had its status revoked is no longer a legal entity and may not initiate a legal action. Superior Piping Contrs.,Inc. v. Reilly Industries, Inc., Cuyahoga App. No. 82567,2003-Ohio-6347, ¶ 16. However, R.C. 1702.60 provides retroactive authority for the actions of reinstated corporations, and states, in part:
 (B) Upon reinstatement of a corporation[ ] * * *, both of the following apply to the exercise of or an attempt to exercise any rights, privileges, or franchises, including entering into or performing any contracts, on behalf of the corporation by an officer, agent, or employee of the corporation, after cancellation and prior to reinstatement * * *:
 (1) The exercise of or an attempt to exercise any rights, privileges, or franchises on behalf of the corporation by the officer, agent, or employee of the corporation has the same force and effect that the exercise of or an attempt to exercise the right, privilege, or franchise would have had if the corporation[ ] * * * had not been canceled, if both of the following apply:
 (a) The exercise of or an attempt to exercise the right, privilege, or franchise was within the scope of the *Page 32 
corporation's articles of incorporation that existed prior to cancellation;
 (b) The officer, agent, or employee had no knowledge that the corporation[ ] * * * had been canceled.
 (2) The corporation is liable exclusively for the exercise of or an attempt to exercise any rights, privileges, or franchises on behalf of the corporation by an officer, agent, or employee of the corporation, if the conditions set forth in divisions (B)(1)(a) and (b) of this section are met.
 * * *
 (D) This section is remedial in nature and is to be construed liberally to accomplish the purpose of providing full reinstatement of a corporation[ ] * * * retroactive, in accordance with this section, to the time of the cancellation * * *.
 {¶ 64} The language of R.C. 1702.60 "shows a legislative intent to validate all actions of the corporation taken during the period from the cancellation * * * to * * * reinstatement, as long as the two conditions set forth in subsection (B)(1) are met." Thomas v. Price (1999),133 Ohio App.3d 585, 590.
 {¶ 65} Here, the record is devoid of evidence establishing that the R.C. 1702.60 retroactive provisions do not apply here. In particular, the record does not establish that, contrary to R.C. 1702.60(B)(1)(a), an officer, agent or employee of appellee had knowledge that appellee's corporate status had been canceled when appellee filed the collection action against appellant. As an example, George, a trustee for appellee, testified that, up until the end of his deposition, he believed that the application for corporate reinstatement correctly indicated that appellee's corporate status was canceled in April 2006, a time after appellee initiated the collection action. Likewise, we reject appellant's contention that "given the many hats worn by David Dye (applicant for *Page 33 
reinstatement, [president and owner of the developer-retained management company, counsel for [appellee], representative of the developer * * *) and also the erroneous date inserted on the application, the issue of knowledge is, at best, a question of fact." The record contains no evidence indicating that Dye, as attorney for appellee, knew that appellee's corporate status was canceled when Dye initiated the collection action on behalf of appellee. Indeed, according to the record, Dye's company, PSAM, was not associated with appellee at the time its corporate status was revoked.
 {¶ 66} Appellant further contends that appellee had no legal capacity to sue because of the implications stemming from appellee erroneously indicating on its application for reinstatement that its corporate status was canceled in April 2006 instead of properly indicating that its corporate status was canceled over a year earlier in April 2005. The implications of such indications in appellee's reinstatement application are covered under R.C. 1702.59(F), which allows reinstatement even after one year. Here, the record is devoid of evidence establishing that, pursuant to R.C. 1702.59(F), appellee could not be reinstated under the same corporate name or that it lacked the legal capacity to initiate the collection action against appellant.
 {¶ 67} In light of our above conclusions, we hold that the trial court did not err by granting summary judgment in favor of appellee in regard to appellant's defenses on the collection action. We next address appellant's first and second assignments of error as they relate to his counterclaims.
 {¶ 68} Initially, appellant asserts that the trial court erred by granting summary judgment in favor of appellee on appellant's CSPA related counterclaims. However, we have already rejected appellant's CSPA arguments. *Page 34 
 {¶ 69} Next, appellant challenges the trial court's decision to grant summary judgment against him in regard to his breach of fiduciary duty counterclaim. "`A "fiduciary relationship" is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" Belvedere Condominium Unit Owners'Assn. v. R.E. Roark Cos., Inc., 67 Ohio St.3d 274, 282, 1993-Ohio-119, quoting In re Termination of Emp. of Pratt (1974), 40 Ohio St.2d 107,115.
 {¶ 70} In Behm v. Victory Lane Unit Owners' Assn., Inc. (1999),133 Ohio App.3d 484, 487-488, the First District Court of Appeals held that a homeowners association has a fiduciary duty to act in the best interest of its property owners. In addition, the appellate court indicated that such a fiduciary duty extends to the maintenance of common areas when, in pertinent part, a homeowners association's governing documents oblige the maintenance of common areas. Id. at 487, fn. 5.
 {¶ 71} Here, appellant first contends that appellee breached its fiduciary duty to appellant by spending money without adhering to reasonable budgetary restraints as required by the Special Warranty Deed. In support, appellant notes that appellee contracted for $47,678.82 for landscaping in 2006, and $31,651.87 for landscaping in 2005. However, such amounts, alone, provide us nothing upon which to conclude that appellee breached its fiduciary duty to appellant, especially given that appellee sought bids for its landscaping work, and considering Pearson's testimony that a "five or ten thousand dollar[ ]" cut in "landscaping costs" would have yielded unsatisfactory results. (Pearson Depo., 27.) *Page 35 
 {¶ 72} Appellant next argues that appellee maintained areas that do not constitute common property in contravention of the Special Warranty Deed, which states that Williams Creek subdivision lot owners pay assessments to appellee for the upkeep of common areas. Appellant asserts that appellee used funds to maintain unoccupied or unkempt private lots. However, the Special Warranty Deed allows appellee to maintain private lots under certain circumstances, and the document allows appellee to recoup the costs through assessments particular to the private lots. Although the record establishes that appellee used its own funds to maintain private lots, the record does not establish that appellee failed to levy an assessment on the private lots to recoup the money. Appellant's testimony disposes of any question of fact on the issue as he testified that he was unaware of anything that appellee has done that it was not supposed to do.
 {¶ 73} Appellant also argues that appellee paid for upkeep of property owned by the city of Columbus. Presumably, appellant is referring to appellee maintaining road frontage owned by the city of Columbus. Appellee imposes assessments for the maintenance of common property, which the Special Warranty Deed defines as property that appellee owns. Despite these provisions, Pearson testified that road frontage is considered a common area of the Williams Creek subdivision. Nevertheless, we decline to conclude that appellee's consideration of road frontage as a common area rises to the level of a breach of fiduciary duty, given appellant's concession.
 {¶ 74} Next, appellant notes that appellee paid to install flowers at a Dominion model home in the subdivision. Again, we need not determine whether this conduct rose to the level of a breach of fiduciary duty, given appellant's concessions. *Page 36 
 {¶ 75} Lastly, appellant argues that appellee breached its fiduciary duty to appellant by failing to adequately maintain the pond area. In particular, appellant notes that, for several months, the pond area was covered with goose droppings, a draw for mosquitoes, and filled with cattails. We decline to find a breach of fiduciary duty based on these contentions. In particular, appellant, in claiming a breach of fiduciary duty, must demonstrate that he sustained injury as a proximate result of appellee's failure to maintain the pond area. See McConnell v. HuntSports Ent. (1999), 132 Ohio App.3d 657, 687. Although appellant contended that it was difficult for him to walk his dog in the pond area due to the goose droppings, appellant has not established that the pond area was otherwise unusable or that he sustained harm from the goose droppings, mosquitoes, and cattails in the pond area. We also find it significant that: (1) appellee ultimately cleaned the pond area; and (2) appellant, in his deposition, effectively disavowed any dispute regarding the pond area when he stated: "Ponds don't mean that much to me." (Zweiful Depo., 28.)
 {¶ 76} For all of these reasons, we conclude that the trial court did not err by granting summary judgment in favor of appellee in regard to appellant's breach of fiduciary duty counterclaim. In regard to appellant's breach of contract counterclaim, we note that courts have applied such a principle to a homeowners association's obligations to its members. See Behm at 487; Wolf v. Southwestern Place CondominiumAssn., Mahoning App. No. 01 CA 93, 2002-Ohio-5195, ¶ 13. Regardless, we reject appellant's arguments concerning the trial court's grant of summary judgment on appellant's breach of contract counterclaim, given that appellant's arguments behind *Page 37 
such a counterclaim are identical to his arguments supporting the breach of fiduciary counterclaim and we have rejected such arguments.
 {¶ 77} In conclusion, we determine that the trial court did not err by granting summary judgment in favor of appellee in regard to appellant's counterclaims. Having already upheld the trial court granting summary judgment in favor of appellee in regard to appellant's defenses, we overrule appellant's first and second assignments of error.
 {¶ 78} In his third assignment of error, appellant argues that the trial court erred by awarding the underlying assessment damages without conducting an evidentiary hearing. We disagree.
 {¶ 79} As we noted, after granting summary judgment in favor of appellee, the trial court awarded appellee $1,040.50 in underlying assessment damages. Appellee sought such damages in its complaint, and appellee supported such an amount through: (1) the bill attached to appellee's complaint; and (2) verification from appellee's attorney.
 {¶ 80} We acknowledge appellant's contention that the running balance includes improper charges, such as for the maintenance of non-common areas. However, we have rejected those challenges. In addition, in light of appellee otherwise proving its underlying assessment damages, we conclude that the trial court did not err by awarding those damages without conducting an evidentiary hearing. See Colony Square Partners v.Nader (Mar. 24, 1998), Tuscarawas App. No. 1CT 97-0021 (concluding that the record allowed a trial court to award damages without an evidentiary hearing after granting a summary judgment motion). Therefore, we overrule appellant's third assignment of error. *Page 38 
 {¶ 81} In his fourth assignment of error, appellant contends that the trial court erred in determining that his counsel engaged in frivolous conduct pursuant to R.C. 2323.51. R.C. 2323.51(B)(1) proscribes "frivolous conduct in civil actions" and allows a court to assess "reasonable" attorney fees against a party and/or his or attorney for such frivolous conduct. Under R.C. 2323.51 (A):
 (1) "Conduct" means * * *:
 (a) The filing of a civil action, the assertion of a claim, defense, or other position in connection with a civil action, the filing of a pleading, motion, or other paper in a civil action, including, but not limited to, a motion or paper filed for discovery purposes, or the taking of any other action in connection with a civil action[.]
 {¶ 82} Likewise, under R.C. 2323.51(A):
 (2) "Frivolous conduct" means * * *:
 (a) Conduct of [a] * * * party to a civil action * * * that satisfies any of the following:
 * * *
 (ii) It is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law.
 (iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.
 (iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief. *Page 39 
 {¶ 83} The analysis under R.C. 2323.51 involves a mixed question of law and fact. Wiltberger v. Davis (1996), 110 Ohio App.3d 46, 51. In accordance with R.C. 2323.51(A)(1), the frivolous conduct statute requires individual examination of each claim or defense, rather than examination of the complaint as a whole, to determine whether frivolous conduct exists. Wiltberger at 53. In examining appellant's claims and defenses, we recognize appellant's reliance on Riston v. Butler,149 Ohio App.3d 390, 2002-Ohio-2308, ¶ 27, 31, where the First District Court of Appeals indicated that R.C. 2323.51 does not deem frivolous a claim or defense merely because it is not well grounded in fact. However, we find Riston inapplicable because that case involved a former version of R.C. 2323.51(A)(2)(a) that did not include prongs (iii) and (iv), which, as noted above, pertains to the absence of evidentiary support for a claim or defense. See Tablack v. Wellman, Mahoning App. No. 04-MA-218, 2006-Ohio-4688, ¶ 149-151. Thus, in Ponder v.Kamienski, Summit App. No. 23270, 2007-Ohio-5035, ¶ 34-35, the Ninth District Court of Appeals upheld sanctions awarded under the current version of R.C. 2323.51(A)(2)(a) where a party proceeded with claims despite "a lack of the required evidence to go forward."
 {¶ 84} Here, pursuant to R.C. 2323.51, we agree with the trial court that appellant's defenses of quantum meruit and the existence of a credit or set-off for collateral benefits paid to appellee were frivolous. We also agree that appellant's counterclaim of unjust enrichment was frivolous. Recognizing Holeton v. Crouse CartageCo., 92 Ohio St.3d 115, 122, 2001-Ohio-109, we note that the credit or set-off for collateral benefits claim necessarily involves a party receiving payment or something of value on behalf of another, and, pursuant to Metz v. Am. Elec. Power Co., 172 Ohio App.3d 800,2007-Ohio-3520, ¶ 43-44, *Page 40 
the claims of quantum meruit and unjust enrichment involve a party needing to compensate another for receiving a service or something of value. Without even discussing whether such defenses and claims apply to servitudes, we note that appellant and his wife refuted these claims and defenses by testifying that they never paid anything to appellee, they never conveyed any personal asset or other thing of value to appellee, and they never had anything of value conveyed to appellee on their behalf.
 {¶ 85} We also agree that appellant's waiver and estoppel defenses were frivolous. Appellant and his wife refuted these defenses by conceding that they were never told by anyone with authority from appellee that they should not pay their annual assessments. Appellant does not even discuss on appeal how such defenses survive an allegation under R.C. 2323.51. Therefore, we decline to discuss the issue further. See 1981 Dodge Ram Van at 168-170.
 {¶ 86} We also agree that appellant's statute of frauds defense was frivolous. In general terms, the statute of frauds, R.C. 1335.05, requires that agreements in effect for more than one year must be in writing and signed by the party charged with its terms. The statute of frauds is irrelevant here, given that appellant verified he signed documents related to the real estate transaction.
 {¶ 87} Next, we agree that appellant's defense that appellee failed to join necessary parties in the collection action was frivolous. Appellant testified that he did not know of anyone else who needed to be a party to the collection action. Moreover, appellant does not discuss on appeal how such a defense survives a claim under *Page 41 
R.C. 2323.51. Therefore, we decline to discuss the issue further. See1981 Dodge Ram Van at 169-170.
 {¶ 88} We also agree that appellant's illegality defense was frivolous because, during his deposition, appellant could point to nothing illegal about the assessment servitude. Again, appellant does not discuss on appeal how such a defense survives a claim under R.C. 2323.51. See1981 Dodge Ram Van at 169-170.
 {¶ 89} We decline to disturb the trial court's conclusions under R.C. 2323.51 in regard to the defense of failure to mitigate and in regard to the fraud counterclaim, given that appellant's deposition provided no support for the issues. Again, appellant does not discuss on appeal how these contentions survive a frivolous claim. See 1981 Dodge Ram Van
at 169-170.
 {¶ 90} We also agree that appellant's defenses and counterclaims under the CSPA were frivolous. As we concluded above, the CSPA is wholly inapplicable here.
 {¶ 91} Next, we agree that appellant's defenses of lack of corporate status and failure of consideration were frivolous. The record provides appellant no factual basis to pursue these claims.
 {¶ 92} We also agree that appellant's defense of failure to state a claim upon which relief may be granted was frivolous. In order for a court to dismiss a complaint on that basis, it must appear beyond a doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. O'Brien v. Univ. Community Tenants Union
(1975), 42 Ohio St.2d 242, syllabus. Here, appellee's complaint sufficiently stated its collection claim. We need not discuss the issue further, given that appellant does not *Page 42 
discuss on appeal how such a defense survives a claim under R.C. 2323.51. See 1981 Dodge Ram Van at 169-170.
 {¶ 93} Finally, we note that, while appellant challenged on appeal the trial court's decision to deem frivolous appellant's breach of contract counterclaim, appellant has made no particularized arguments on appeal regarding how his breach of contract claim constitutes a defense to the collection action, e.g., through principles of anticipatory breach. Similarly, appellant has made no particularized arguments on appeal in regard to his unclean hands defense. Thus, we need not address whether the trial court erred by deeming frivolous: (1) appellant's breach of contract contention as a defense; and (2) appellant's unclean hands defense. See 1981 Dodge Ram Van at 169-170.
 {¶ 94} We next address the trial court's decision to deem frivolous appellant's defenses of: (1) unconscionability, with its two prongs of procedural and substantive unconscionability; and (2) contract of adhesion, which is related to procedural unconscionability. We also address the trial court's decision to deem frivolous appellant's breach of fiduciary duty and breach of contract counterclaims.
 {¶ 95} Initially, we reiterate that procedural unconscionability generally concerns circumstances surrounding the parties' bargaining process. See Taylor Bldg. at ¶ 43. We acknowledged above that the documents pertaining to the real estate transaction here were "standardized" forms and had qualities of a contract of adhesion. Thus, appellant supplied evidence in an attempt to support procedural unconscionability and the related contract of adhesion defense.
 {¶ 96} Substantive unconscionability involves the reasonableness of the terms that culminated from the parties' agreement. SeeKhoury at ¶ 12. Here, we note *Page 43 
Pickering's initial testimony that a "fairly average" homeowners association assessment for homes "valued over $200,000 a year" would be $200, and we recognize that, in 2005, appellee's assessment for his $155,900 purchased home was $205. (Pickering Depo., 13-14.) In this regard, appellant supplied evidence in an attempt to support substantive unconscionability.
 {¶ 97} Next, in regard to appellant's breach of fiduciary duty counterclaim, we acknowledge evidence that appellant supplied in his attempt to demonstrate that appellee paid expenses in contravention of the Special Warranty Deed, including landscaping expenses for the model home and the entrance and maintenance expenses for trees located on property owned by the city of Columbus. Appellant relied on this same evidence to support the breach of fiduciary duty counterclaim. Accordingly, appellant supplied evidence in an attempt to support the breach of contract and breach of fiduciary duty counterclaims.
 {¶ 98} As we detailed above, we agree with the trial court that appellant's unconscionability and contract of adhesion defenses and breach of contract and breach of fiduciary duty counterclaims do not survive summary judgment. However, appellant did submit evidence in support of these defenses and counterclaims. Therefore, we do not agree with the trial court that they had no basis in fact or law and, therefore, were frivolous under R.C. 2323.51. Accordingly, we reverse that portion of the trial court's decision.
 {¶ 99} In summary, we conclude that the trial court did not err in determining that appellant's counsel engaged in frivolous conduct under R.C. 2323.51 by pursuing most of the defenses and counterclaims raised by appellant in this case. However, we *Page 44 
conclude that the trial court erred in finding that appellant's counsel engaged in frivolous conduct by pursuing the defenses of unconscionability and contract of adhesion and the counterclaims of breach of contract and breach of fiduciary duty. Accordingly, we overrule in part and sustain in part appellant's fourth assignment of error.
 {¶ 100} In his fifth assignment of error, appellant argues that Dye is acting in a pro se capacity in this litigation and, therefore, that the trial court could not properly award attorney fees here. A pro se litigant is "`one who does not retain a lawyer and appears for himself in court.'" F.D.I.C. v. Anchor Properties (C.A.1, 1994), 13 F.3d 27, 31, quoting Black's Law Dictionary (6th Ed. 1990) 1221. An attorney acting in a pro se capacity is not entitled to an award of attorney fees. Kay v. Ehrler (1991), 499 U.S. 432, 438.
 {¶ 101} In arguing that Dye is a pro se litigant here, appellant contends that appellee and Dye, "are one and the same" because "Dye owns the management company (PSAM); Dominion has abdicated all control to PSAM (Mr. Dye); PSAM determines the relevant expenses of the association and the assessment related thereto, collects the assessments and documents a `fee' for such actions." Despite these contentions, it remains that Dye was not brought into this litigation as a plaintiff or defendant. Rather, Dye is appearing on behalf of appellee, a corporation specifically named as the plaintiff in the collection action and the defendant in the counterclaim. In this regard, Dye is not representing himself here, but is representing an organization. Therefore, we overrule appellant's fifth assignment of error.
 {¶ 102} In his sixth assignment of error, appellant argues that the trial court lacked jurisdiction to adjudicate appellee's collection action because appellee sought relief in *Page 45 
excess of the jurisdictional limit for municipal court. Pursuant to R.C. 1901.17, "[a] municipal court shall have original jurisdiction only in those cases in which the amount claimed by any party * * * does not exceed fifteen thousand dollars." A municipal court is required to dismiss an action with relief sought beyond the statutory monetary restrictions. State ex rel. Natl. Emp. Benefit Servs. v. Court of CommonPleas (1990), 49 Ohio St.3d 49, 50. It is the amount claimed, not the amount recovered, that determines jurisdiction. Staffilino Chevrolet,Inc. v. Balk, 158 Ohio App.3d 1, 2004-Ohio-3633, ¶ 11.
 {¶ 103} Here, in its initial pleading, appellee stated that appellant "currently owed * * * $1240.50, plus costs." In stating this amount, appellee noted that appellant owed "$1040.50 in accrued assessments, penalties, interest and/or late fees, and attorney's fees to date in the amount of $200.00." Thus, in its complaint, appellee did not seek relief in excess of the jurisdictional limit for municipal court.
 {¶ 104} After the trial court awarded appellee summary judgment, and after appellee sought R.C. 2323.51 sanctions, appellee filed a "summary of attorney's fee damages." In the summary, appellee indicated that it incurred $25,529.50 in legal fees to litigate the case against appellant. In addition, in its motion for sanctions, appellee argued, in part, that, under R.C. 2323.51, the trial court could order appellant's attorney to pay all of appellee's attorney fees. Through such an argument, appellee sought attorney fees under R.C. 2323.51 for $25,529.50, which is in excess of the municipal court's monetary jurisdictional limit. In Grossman v. Mathless Mathless (1993),85 Ohio App.3d 525, 528, we previously held that a municipal court lacks jurisdiction to entertain a motion for sanctions under R.C. 2323.51 when a party seeks such sanctions *Page 46 
in excess of the municipal court's monetary jurisdictional limit. We held that such was the case even if the municipal court awards a sanction within the jurisdictional limit. Id. at 528-529.
 {¶ 105} However, the Ohio Supreme Court has subsequently held that "when a statute authorizes the awarding of attorney fees, it does so by allowing the fees to be taxed as costs rather than awarded as damages."Christe v. GMS Mgt. Co., Inc., 88 Ohio St.3d 376, 378, 2000-Ohio-351. In this regard, the Seventh District Court of Appeals recognized that "the Supreme Court's holding and reasoning [in Christe] have basically superseded * * * prior appellate court cases that have held that a request * * * for statutorily permitted attorney fees should be considered in determining" whether a claim exceeded a court's monetary jurisdictional limitations. Staffilino at ¶ 15 (specifically citing toGrossman as one of the cases that have been superseded).
 {¶ 106} Nevertheless, appellant argues that, contrary toStaffilino, "Grossman has been cited as good law on two separate occasions by the Ohio Supreme Court" in State ex. rel. Kreps v.Christiansen, 88 Ohio St.3d 313, 2000-Ohio-335, and State ex rel. Hummelv. Sadler, 96 Ohio St.3d 84, 2002-Ohio-3605. However, such cases did not involve an analysis on whether attorney fees are considered costs as opposed to damages, and, therefore, we agree with the conclusions inStaffilino that Christe implicitly overruled Grossman on the attorney fees issue.
 {¶ 107} Therefore, we conclude that, pursuant to Christe andStaffilino, attorney fees requested under R.C. 2323.51 are considered costs and not subject to the municipal court's R.C. 1901.17 monetary jurisdictional limit. Thus, to the extent that *Page 47 
appellee sought $25,529.50 in attorney fees under R.C. 2323.51, we conclude that the amount of such a request did not divest the trial court of jurisdiction in this matter.
 {¶ 108} Appellant next argues that, to the extent that appellee sought to recover attorney fees pursuant to appellant's obligation in the assessment servitude, appellee sought monetary damages in excess of the municipal court's R.C. 1901.17 monetary jurisdictional limit. Specifically, appellant notes that, during the April 2007 hearing, appellee's attorney referenced a "$24,000 * * * round figure of the full prayer against [appellant]." (Tr., 54.)
 {¶ 109} However, according to Staffilino, Ohio law suggests that even an award of attorney fees not based on a statutory scheme would still constitute costs and, thus, not considered in determining whether a claim exceeds a court's monetary jurisdictional limits. Specifically, the appellate court in Staffilino stated:
 * * * "Under our common law, attorney fees are in the nature of costs." Christe, 88 Ohio St.3d at 378 * * *.
 * * * As the Supreme Court advised, if attorney fees were considered damages, then we would be faced with an issue surrounding the right to have a jury decide the amount of damages instead of the typical case of the court determining the amount of fees. Id.
Staffilino at ¶ 18-19. Although Staffilino did not involve a party's agreed obligation to pay attorney fees, but, rather, involved the bad-faith exception to the rule against attorney fee shifting, we find nothing in the above analysis that makes such a distinction pertinent because, in the final analysis, Christe does not equate attorney fees to costs.
 {¶ 110} For these reasons, we conclude that R.C. 1907.17 did not preclude the trial court from exercising jurisdiction over appellee's collection action. Accordingly, we overrule appellant's sixth assignment of error. *Page 48 
 {¶ 111} In summary, we overrule appellant's first, second, third, fifth, and sixth assignments of error. We overrule in part and sustain in part appellant's fourth assignment of error. Accordingly, we affirm in part and reverse in part the judgment of the Franklin County Municipal Court. Having reversed a portion of that court's basis for awarding attorney fees under R.C. 2323.51, we remand this matter to the trial court for reconsideration of appellee's motion for sanctions.
Judgment affirmed in part, reversed in part, and cause remanded withinstructions.
 BROWN and KLATT, JJ., concur. *Page 1